Banco de Puerto Rico, etc., Plaintiff and Appellee, *v.* Tomás Rodríguez et al., Defendants and Appellants.

No. 7390. Argued February 1, 1938.—Decided May 13, 1938.

*Dubón & Ochoteco* for appellants. *C. Domínguez Rubio* and *Luis Domínguez Rovira* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

On September 5, 1931, in Cayey, P. R., the defendants signed and delivered to the Banco Comercial de Puerto Rico a promissory note which copied literally, insofar as pertinent, reads as follows:

"Amount $15,082.25.—Due October 30, 1931.—We will jointly pay to the Banco Comercial de Puerto Rico, at its place of business, or to its order, on October 30, 1931, the sum of fifteen thousand eighty-two and 25/100 dollars, value received as a loan and we also obligate ourselves jointly to pay interest at 12 per cent per annum in case of default, and the costs and expenses which may be incurred in collecting this debt as well as the fees of the attorney which the Bank may use in case of a judicial claim. . . ."

And on December 18, 1934, the Banco de Puerto Rico, as liquidator of the Comercial, brought this action on the note.

The defendants admitted that they had signed and delivered the note and that they had not paid it, alleging that they were not liable because the action was barred by the lapse of three years in accordance with section 946 of the Code of Commerce, 1932 edition.

The plaintiff insisted that its action was not barred because the section cited by the defendants was not applicable since the note which they signed and delivered was not a "commercial" note.

The case went to trial and the court rendered judgment for the plaintiff on the following grounds:

"It has not been shown in this case that the loan which caused the issue of the promissory note on which the present action is brought constitutes a mercantile operation. The contrary may rather be inferred from the explanations given by witnesses Juan Diez de Andino and Francisco Fernández Colón, and therefore, the note in question may only be considered as the expression of the obligation to repay an amount loaned, with the agreed interest, to which loan a commercial character cannot be given for lack of the second of the conditions required by section 229 of our Code of Commerce, since it has not been shown, in our opinion, that the money loaned was destined for commercial transactions, but rather that it was obtained and used by the defendants in agriculture, and in the planting of tobacco, in which they were preferentially engaged. . . ."

The defendants appealed to this court. They assign several errors which need not be studied separately because everything in this case finally merges into one question, to wit: whether or not the promissory note in question is mercantile.

We have seen its terms. At the trial, witnesses Diez de Andino and Fernández Colón testified for the plaintiff.

The former was an employee of the Banco Comercial and continued to be such under the receiver. He said that the obligation had not been paid, that the Banco Comercial had no commercial establishment whatever, that it did not make

loans on merchandise but only on signatures or mortgage or collateral security.

The latter stated that he was manager of the branch maintained by the bank in Cayey; that he knew the defendants none of whom was a merchant, and who were engaged in agriculture, and also in buying and selling cattle, coffee, tobacco and urban property.

Tomás and Rafael Rodríguez, two of the defendants, testified in their own behalf.

The former said that his occupation was "industrial, agricultural," that he was principally engaged in buying and selling produce and cattle, and later on cross-examination by the attorney for the plaintiff he answered as follows:

"Q. How much tobacco did you plant?—A. Well I planted, for example, 500 quintals of tobacco and acquired two thousand, it was for that purpose that the Banco Comercial gave me the greater part of the money and I bought tobacco because I didn't need it for refaction because my refaction for 500 quintals of tobacco . . . look here, right now I am planting and I am not borrowing, but then I was engaged more in buying.—Q. So you bought tobacco with the money the Bank gave you?—A. Yes, sir.—Q. You had no business? —A. No, sir.—Q. You had no business establishment?—A. No, sir. —Q. Nor your wife either?—A. No.—Q. That year, 1931, can you tell us, to the court here . . . that money . . . that $15,082.25 which is the amount of the obligation, in what purchases of tobacco you invested it?—A. That money was not given to me by the bank at one time, fifteen thousand dollars. The bank gave me three thousand dollars, three thousand more, two thousand, five thousand, as I needed it, according to the purchases of tobacco I made or bought a lot or anything and I borrowed from the bank and signed a note for the amount I borrowed. . .—Q. But the fact is that that money was in the bank at your disposal as a loan?—A. Yes, sir. . .—Q. But with respect to this specific transaction for $15,082, how did you invest that money if you remember?—A. Well I invested the greater part in buying and other money which I put in the bank from the cooperative of which I was president about two thousand quintals of tobacco, you know that tobacco that cost 30, 31 and 32 dollars sold for 7 or 8 dollars and that's what caused the trouble and everything was lost and I used that money in that tobacco. . .—Q. I am going to

ask you the following question: Did you or did you not buy with part of that $15,082.25 the tobacco or part of the tobacco which you later deposited in the Tabacaleros?—A. Yes, sir.—Q. What else did you buy with part of that money —A. Well, I bought cattle, lots, houses, I sold and bought, that was my business then, not now because I have nothing to do it with. . . ."

On cross-examination by the attorney for the plaintiff he answered thus:

"Q. Tell me, don Rafael, how long have you been engaged in those transactions of sales of tobacco and cattle?—A. All my life, I inherited it from my father. . .—Q. You also plant tobacco? Yes, sir. . .—Q. Can you assure the court that in September 1931 you bought tobacco?—A. During the crop season I have always bought tobacco until now about two years ago.—Q. And when is this crop season?—A. Well about this time, since April and May.—Q. And cattle?—A. I buy cattle all year.—Q. Do you slaughter?—A. I slaughter and sell.—Q. In Cayey?—A. In Cayey.—Q. Do you own real property at present?—A. We have a farm here my brother and I in partnership. . .—Q. Don Rafael, from whom did you buy cattle in September of 31?. . .—A. Well, from several.—Q. But tell me the names.—A. I bought in Aibonito, in Coamo.—Q. From whom did you buy in Aibonito and Coamo?—A. I bought from many, Ramón Ortiz, from another named Negrón, from Paco Gil from many people.—Q. For slaughter?—A. For slaughter. In Cayey, from the Aragundes, from Agustín Fernández, from the Central Cayey, and from everyone who sells to me.—Q. Did you also plant tobacco?—A. A little.—Q. How many quintals was that little?—A. About two hundred quintals. . .—Q. You also had refaction?—A. Yes, I did.—Q. Did you also have sharecroppers? —A. I also had sharecroppers.—Q. And did you also buy tobacco? —A. Yes, I bought. . .—Q. Did you ever have a commercial establishment?—A. Never, never, when I was young. . . . More than thirty years ago.—Q. But in the year 31 you had no store?—A. No, sir.—Q. Nor did Rafael?—A. Nor Tomás.—Q. Pardon me, did your sister-in-law doña Angelina not engage in business.—A. No."

Section 946 of the Code of Commerce says:

"Section 946.—(Section 950, Code of Commerce of 1886, as amended by Act No. 42, 1930, page 320.) Actions arising from

drafts shall extinguish three years after maturity, whether such drafts have been protested or not.

"A similar rule shall be applied to commercial bills of exchange and promissory notes, checks, stubs and other instruments of draft or exchange and to coupons and amounts for the redemption of obligations issued in accordance with this Code."

This section is the same as section 950 of the Code of Commerce published in the Compilation of 1911, page 1320, with the exception that by virtue of the amendment the "dividends" were eliminated in the second paragraph from the period of limitations which it fixes.

In accordance with the cases, a note made payable to order, such as the one giving rise to this action, carries with it the presumption *juris tantum* that it is mercantile. *Pierluisi* v. *Monllor,* 42 P.R.R. 6, *Vázquez* v. *Laíno,* 23 P.R.R. 218, and *Blondet* v. *Garáu,* 47 P.R.R. 820, and the authorities therein cited.

Was the presumption destroyed? Recently in the case of *Barceló & Co., S. en C.* v. *Olmo,* 48 P.R.R. 239, which also dealt with a note payable to order, this court, speaking through Mr. Justice Hutchison, said:

"We cannot agree with the court below that the original transaction between López and Carlos Olmo was a commercial transaction. A loan is not necessarily a commercial transaction. Neither López nor Carlos Olmo was a merchant at the time of the loan. If either had been a merchant, or if both had been merchants at the time of the loan, that fact would not have converted the loan into a commercial transaction. López was a farmer. He had never been a merchant, had no intention of becoming a merchant, and did not become a merchant, when he and Javier Olmo executed the notarial instrument which made him nominally a partner in Javier Olmo & Co. He never received nor expected to receive any salary or profits from the business of Javier Olmo & Co. During the life of the partnership he neither received nor expected to receive any interest on the money advanced by him. The note itself executed some two years later was to bear interest after the date of maturity only. Even the idea of substituting the name of López for that of Carlos Olmo in the notarial instrument did not originate with López, but

was suggested by the notary because of the fact that Carlos Olmo was a minor. The mere fact that the loan was made for the purpose of enabling the borrower to engage in business and that the proceeds were used for the purchase of merchandise and thus absorbed in the mercantile business of Javier Olmo & Co. did not convert the loan into a commercial transaction. The character of the loan depends upon the character of the transaction itself as disclosed by the attendant circumstances or by the antecedent facts, not by the purpose of which it was made nor by the manner in which the proceeds were invested or used. . All the surrounding circumstances point persuasively to the conclusion that the loan in the instant case was not a commercial transaction and therefore that the action was not barred by the lapse of three years, notwithstanding the presumption *juris tantum* arising out of the fact that the note in question was payable to order.''

The Supreme Court of Spain in a case of a note payable to order, rendered the following decision on April 10, 1894:

''In order for a voucher or a promissory note to have the juridic value of a mercantile document, it is not sufficient for it to fulfill the conditions provided in section 571 of the Code of Commerce; it is also necessary that it arise from mercantile transactions, as provided in section 558:

''And this is not the case with a note in which it is only stated that the obligor received a certain sum of money for a mercantile transaction, an isolated statement which does not show that the loan arose, as the law requires, from a commercial transaction; nor can it have any legal value if it is not shown that that amount was actually used for that purpose.'' (75 *J. C.* 483.)

And in a similar case it was held, on October 11, 1919, that:

''Pursuant to the doctrine established by the decisions of the court in applying section 2 of the Code of Commerce in force, it is a question of fact to be decided by the trial court whether such transactions are or are not commercial, insofar as they are invested with or do not have the nature of mercantile transactions.

''The Supreme Court has repeatedly rendered decisions in which it has uniformly and clearly decided the correct and intelligent interpretations that should be made in applying sections 59, 531, 532 and 533 of the Code of Commerce, and these decisions hold that

only when there are doubts which cannot be decided in accordance with section 2, will the decision be made in favor of the debtor, and for a note to be a mercantile obligation it is not enough that it fulfill all the requirements of section 571 of the old Code of Commerce, which are now set out in section 531 of the Code in force, but it is also necessary that it should arise from commercial transactions, as was required by section 558 of the Code of 1829 and is also required by paragraph 7 of the aforesaid section 531. This requirement does not appear from a note which reads 'for value received' since that is not what is required by section 532 for the purposes of producing the effects therein stated, for it is necessary and inescapable to prove that the obligor used the money received for commercial transactions." (144 *J. C.* 387)

In the Statement of Motives relating to Title V, Book II of the Code of Commerce, the Spanish legislator expressed himself as follows:

"Among the new matters introduced in the Code in force with regard to loans, it is well to note, in the first instance, that which attributes a mercantile character to all those contracted for the purposes of mercantile transactions, wherever one of the contracting parties, the obligee or the obligor is a merchant, repealing, in this part, the too restrictive provision of the Code, which requires that quality in both parties in order to establish any loan as mercantile. Commercial legislation, under the benefits of this reform, will cover and protect many loans which are at present regulated by civil law, although they are strictly commercial transactions, simply because one of the parties is not a merchant and the investment of capital in this branch of human activity will be furthered and stimulated by the incentive of profit and by the greater security which that legislation offers." (The New Code of Commerce for the Peninsula and the Antilles, by Vicente Romero y Girón, second edition, p. 238.)

And R. Gay de Montellá, in his Code of Commerce annotated, Volume III, p. 121, says:

"Mercantile loans are characterized either by the mercantile character of one of the parties, or because the things loaned are destined for commercial transactions. The mercantile loan is a contract which may be made between merchants, but the special characteristics of this contract are found principally in the banking and

export businesses. We will now proceed to study the special forms of mercantile loans which today form the frame-work of modern commerce.

"Mercantile loans are usually made either by a banker or a merchant obligating himself to lend to another person," whether a merchant or not, a certain sum, as he may need it, which is called a *current account,* or by signing promises to pay or reimburse, the form and effects of which vary according to the way and manner in which they are expressed (issuance of notes or bills of exchange). All of these loans may be made with or without collateral security. The former are accompanied by the *indenture,* mortgage, pledge, aval, letters of guaranty, etc. The latter have no security or responsibility other than the personal one of the obligor."

Upon examining the evidence in the light of the law, of the foregoing decisions, motives of the legislators, and commentaries, we find the case indeed somewhat doubtful. The courts are inclined not to apply the statute of limitations unless the mercantile character of the transaction clearly appears, since it involves a relatively short term and debts whose existence is not even questioned. Following this trend and giving the judgment of the trial judge all the weight to which it is entitled, we must give the plaintiff the benefit of the doubt. Furthermore, the testimony of the defendants—which was the only evidence they presented—was very vague and incomplete. The testimony of the defendants, although sufficient to raise a doubt in the mind of the judge, was not enough to convince him that the loan was made to the defendants, who were not professional merchants, in order that they might use the proceeds for commercial transactions which they later actually effected, and not for the purpose of improving their lands, and of course for any other transaction which might suggest itself to them and which they might consider beneficial in the ordinary course of their business.

Under these circumstances, we feel that the judgment appealed from should be affirmed.